[No. 44689.   En Banc.   October 19, 1978.]

WASHINGTON FEDERATION OF STATE EMPLOYEES, AFL–CIO, COUNCIL 28, *Appellant,* v. SPOKANE COMMUNITY COLLEGE, ET AL, *Respondents.*

*Clifford F. Cordes, Jr.,* (of *Cordes, Cordes & Younglove*), for appellant.

*Slade Gorton, Attorney General,* and *James A. Mc–Devitt, Assistant,* for respondents.

HOROWITZ, J.—The dispositive question here is whether a governmental agency which is expanding its facilities may contract with an independent contractor to provide services in those facilities which are customarily done by civil servants, where there is no showing the services could not be done by civil servants and where the sole reason for entering into the contract relationship is an anticipated savings in cost. The court below, interpreting the relevant civil service statutes, held there was no bar to such a contract and approved the contract at issue here. We reverse.

In April 1976, the Washington State Community College District No. 17 (the College) advertised for bids for a contract to provide custodial services for a new administration building at the Spokane Community College. The Washington Federation of State Employees (the Federation), appellant herein, objected on the ground that custodial services have historically been provided by civil service staff employees of the College. A 1–year contract was nonetheless awarded to the American Building Maintenance Co. of Spokane.

The reason given by the College for contracting out for the custodial services is a substantial projected cost savings. The annual gross pay for one civil servant custodial employee to provide the required service would be, at a minimum, $6,360. Accompanying costs, the court found, would raise the total employee custodial service cost to $15,684 annually. The 1–year contract, on the other hand, would provide equivalent services for $4,788. The anticipated cost savings is thus more than $10,000 per year. Moreover, the College expects that contracting out for custodial service for its five other new buildings and additions

would save a total of $210,000 per year. The resulting savings, it is argued, would be applied to student instruction.

The Federation filed a complaint in June 1976 for an injunction against the College giving effect to the contract, and a declaratory judgment the contract was illegal and void. A temporary injunction issued. By motion and affidavit the Federation moved for summary judgment; the College cross–moved for summary judgment. In a memorandum opinion filed in November 1976 the court below held there was no genuine issue of material fact, that there was no bar to the contract in the relevant civil service statutes, and the College was entitled to summary judgment. Statutory attorney fees were awarded to the College.

On appeal the Federation contends the court erred in entering summary judgment for the College because it may not, as a matter of law, contract for services regularly and historically provided by staff employees. In the alternative, the Federation contends that, if the College has the power to contract for such services, it may only do so if real cost savings will be made. The Federation argues there is genuine issue of material fact regarding the savings to be made in this case, making summary judgment inappropriate. The College cross–appeals, alleging it is entitled to full attorney fees. We hold that, as a matter of law, the College has no authority to enter into a contract for new services of a type which have regularly and historically been provided, and could continue to be provided, by civil service staff employees, and that the contract entered into here is void. Therefore we do not reach the other issues presented.

■ The central issue is one of statutory construction. The State Higher Education Personnel Law, RCW 28B.16, creates a civil service system for nonprofessional employees of state institutions of higher learning, including state community colleges. *Cunningham v. Community College Dist. 3*, 79 Wn.2d 793, 798, 489 P.2d 891 (1971). Although certain exemptions are created from coverage of the law, it specifically provides that "no nonacademic employee engaged in office, clerical, *maintenance,* or food and trade services may

be exempted". RCW 28B.16.040. (Italics ours.) The legislature's intent to give full civil service protections to maintenance workers is thus clear.

The second statute involved is RCW 43.19.190, which sets out the powers and duties of the state purchasing director for the Department of General Administration. This statute was amended in 1976 to grant to the purchasing director the power to "[p]urchase all material, supplies, *services* and equipment needed for the support, *maintenance,* and use of all state institutions, colleges, community colleges and universities". (Italics ours.) This authority may be delegated to state agencies. RCW 43.19.190(4). The College contends this provision is to be construed as authorization to contract for custodial services in its new buildings.

The main argument of the College, and the grounds upon which the court below granted the College's motion for summary judgment, is that the personnel law applies only to existing civil service employees. It is said to protect them from discharge, lay–off or transfer (except under statutorily authorized circumstances) but not to protect any specific type of service performed, or flatly prohibit procurement of maintenance services by contract. In this case, the College points out, there is no discharge, transfer or lay–off of civil service employees. Although the services are of a type which could be performed by civil servants, they have not performed these *particular* services in the past because the need for them is totally new. The general administration law provision cited above, it is argued, authorizes the College to enter into a contract for the provision of these services as an alternative to creating new positions for classified government employees.

Furthermore, it is argued, the College's action is not an attempt to thwart the purposes of the civil service system. In view of the substantial savings anticipated, the College maintains its action is both reasonable and necessary to the achievement of its goal of providing a high quality of education to its students.

In support of its view the College points to *Sigall v. Aetna Cleaning Contractors*, 45 Ohio St. 2d 308, 345 N.E.2d 61 (1976), in which the Ohio Supreme Court found no violation of state civil service laws where services of a type usually provided by classified civil service employees were provided by an independent contractor. In that case the state agency, Kent State University, had been unable to maintain a full complement of state custodial workers despite active recruitment programs. The University had thus been forced to contract for additional custodial services for almost 10 years. Despite these special circumstances, however, the Ohio court's holding was a broad rule that the civil service statutes did not expressly prohibit the contracting–out for services, and that where such a contract results in a saving of state funds it does not violate civil service laws. *Sigall v. Aetna Cleaning Contractors, supra* at 314.

We cannot agree with the reasoning of the College and the *Sigall* case because it ignores the essential purpose of our civil service system—to establish a merit system regarding the selection, appointment and classification, as well as the discipline and discharge, of state personnel. *Herriott v. Seattle*, 81 Wn.2d 48, 61, 500 P.2d 101 (1972); *Gogerty v. Department of Institutions*, 71 Wn.2d 1, 4–5, 426 P.2d 476 (1967). *See* RCW 28B.16.010 (State Higher Education Personnel Law); RCW 41.06.010 (state civil service law). The policy of the civil service system is to establish merit as the basis for selecting personnel. It creates a classified service composed of civil servants selected on the basis of merit to fill the state's personnel needs. Procurement of services ordinarily and regularly provided by classified civil servants through independent contracts, although not specifically prohibited by the State Higher Education Personnel Law, directly contravenes its basic policy and purpose. *Osterlof v. University of Washington*, 17 Wn. App. 621, 564 P.2d 814 (1977). Therefore, where a new need for services which have been customarily and historically provided by civil servants arises, and where there

is no showing that civil servants could not provide those services, a contract for such services is unauthorized and in violation of the State Higher Education Personnel Law.

This is so regardless of the cost savings which might be made through such a contract. The civil service laws embody a determination that the interests of the state are best served by a system of merit selection of personnel. Such a determination goes beyond considerations of mere costs to encompass other benefits such as efficiency and avoidance of the "spoils" system. *Herriott v. Seattle, supra.* Thus, an anticipated or real savings in cost cannot be a basis for avoiding the policy and mandate of civil service laws. *Cunningham v. Community College Dist. 3, supra* at 804–05.

Our position is firmly supported in civil service law.

The general rule is that public services are to be performed wherever practicable by public employees. Neither a private individual nor a firm may be hired to perform the normal or routine duties of a public agency. The agency may, however, "farm out" work which is beyond the capacity of the agency to undertake. If the contract establishes no more than an employer–employee relation, the merit system of filling public employments would be violated.

We may conclude, therefore, that where the public agency seeks to make an agreement with an individual to perform personal services for the municipality under its direction and supervision (as is done in cases of its regular employees), or makes an agreement delegating to an individual, firm or corporation the authority to employ persons to perform personal services for the government, to be paid by the government and to be directed and supervised by the governmental agency, or it clearly appears that such arrangement seeks to evade the civil service law and rules, such contract employments would be held invalid.

H. Kaplan, *The Law of Civil Service* 98–99 (1958).

The courts of New York and California have reached the same conclusion. *Turel v. Delaney,* 285 N.Y. 16, 32 N.E.2d 774 (1941) (civil service laws governing selection of public

servants require appointment by competitive exam and prohibit contract with individual to provide services); *Stockburger v. Riley,* 21 Cal. App. 2d 165, 68 P.2d 741 (1937) (services to be performed by civil servants may not be performed by independent contractor even if greater economy and efficiency can be obtained). Although the civil service systems of those states were adopted pursuant to mandates found in the state constitutions, the basic purposes and policies of the systems are identical to ours.

Moreover, our interpretation coincides with the interpretation given the federal civil service laws by the general counsel of the civil service commission. An opinion from that counsel regarding the nature of services which must be performed by federal civil servants was enforced as the relevant legal standard by a federal district court in *Lodge 1858, American Fed'n of Gov't Employees v. Administrator, NASA,* 424 F. Supp. 186 (D.D.C. 1976). The court there concluded that federal civil service laws prohibited NASA from entering into contracts to provide services which had certain specified characteristics of civil service. While the characteristics listed there do not all have relevance to this case, the general rule applied does:

> "In the absence of clear legislation expressly authorizing the procurement of personnel to perform the regular functions of agencies without regard to the personnel laws, we must insist on scrupulous adherence to those laws and the policies they embody. Accordingly, contracts which, when realistically viewed, contain . . . the following elements . . . constitute the procurement of personal services proscribed by the personnel laws.

*American Fed'n of Gov't Employees v. Administrator, NASA, supra* at 190.

In view of the basic purpose and policy of the State Higher Education Personnel Law, we conclude that the general power of the purchasing director to procure services for community colleges granted in RCW 43.19.190 cannot be construed to authorize contracts for services ordinarily provided, and capable of being provided by civil servants.

The interpretation suggested by the College would derogate substantially from the rights, both express and necessarily implied, of civil service employees. We are not persuaded the legislature intended such a derogation, in the absence of any clear legislative expression to that effect. We recognize that some services have historically been procured by contract. We agree with the Federation, however, that RCW 43.19.190 was not intended to enlarge the authority of the Director of General Administration with regard to the types of services which may be so procured. The contract entered into here would be such an enlargement. We therefore hold the contract was unauthorized, and is void.

Reversed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, and DOLLIVER, JJ., concur.

HICKS, J. (dissenting)—Having reviewed the State Higher Education Personnel Law, RCW 28B.16, and found it lacking, the majority simply dons its legislating hat and drafts a provision which accomplishes what the statute did not. Such legislating by the court, undesirable in any event, is particularly flagrant in this instance. The rule announced goes far beyond the expressed purpose of the personnel statute and simply eliminates the authority to contract conferred by another statute, RCW 43.19.190(2).

The purpose of RCW 28B.16 is clearly stated in its opening paragraph:

> The interests of state institutions of higher education and the *employees* of those institutions will be furthered by the enactment of a system of *personnel administration* designed specifically to meet particular needs in connection with *employer–employee* relations in the state institutions of higher education. The general purpose of this chapter is to establish a system of *personnel administration* for the institutions of higher education in the state which is based on merit principles and scientific methods, and which governs the appointment, promotion, transfer, layoff, recruitment, retention, classification

and pay plans, removal, discipline, and welfare of *employees covered under this chapter.*

(Italics mine.) RCW 28B.16.010. It is clear that the coverage of the act is limited to matters of "personnel administration" and "employer–employee" relations. The act does not purport to dictate when the state must create a position of employment. It merely regulates the manner in which existing positions of employment are filled and governs the promotion, transfer, and dismissal of employees once they have been hired.

That the act protects employees, rather than particular services or types of work, is also abundantly clear from subsequent provisions of the act. The words "employees" or "personnel" appear in nearly every section, reiterating the purpose of protecting those persons. Not one single provision even so much as suggests the broader purpose of specifying particular services which must be performed by state employees.

Even RCW 28B.16.040, upon which the majority relies, merely provides that no maintenance "employee" may be exempted from the act. This plainly means only that the state must provide the protections of RCW 28B.16 to all maintenance workers with whom it has established an employer–employee relationship. It does not mean that every time the state constructs a new building and thereby has a need for maintenance services, it must establish such a relationship by creating a new position of employment. The state has the option, or did until the majority decreed otherwise, to perform new services with its own employees or to contract out for those services.

No case construing RCW 28B.16 finds in the act any general direction as to what services might be contracted out by the state. Like the act, the cases applying it are confined to the protection of employee relationships which have been previously established by the state.

In *Cunningham v. Community College Dist. 3*, 79 Wn.2d 793, 489 P.2d 891 (1971), we held only that a college which for several years had operated a food service facility with

its own employees, could not effectuate a termination of those employees by contracting out the services they performed. The termination was found not in accord with specific administrative regulations and the state was ordered to reinstate the protected employees to their positions. Nothing in that case suggests that the contracting out of food services would be unlawful where no current employees were affected.

In a related context, the Court of Appeals has recently held that where a reduction in force is necessary, a person employed in an unauthorized consultant status must be let go before a civil service employee protected by the act. *Osterlof v. University of Washington*, 17 Wn. App. 621, 564 P.2d 814 (1977). That case concerned two persons, one of whom though acting as an employee of the University, was classified not as an employee but as a "consultant", a non-civil service status. As to that person, it was clear that the University had attempted to circumvent RCW 28B.16 by establishing what essentially was an employer–employee relationship in a manner inconsistent with the requirements of the act. The other person involved was employed within the terms of RCW 28B.16 as a protected civil service employee. The only question in the case was which of these persons had job priority when a reduction in the work force became necessary. The court ruled in favor of the protected employee and ordered her reinstatement over the "unauthorized consultant".

Again, nothing in the case deals generally with the authority of a college to contract out services nor does it in any way suggest that RCW 28B.16 applies in situations where a position of employment has not been created by the state.

Purportedly relying on *Osterlof* and its own statement of the act's purpose, the majority concludes:

> Therefore, where a new need for services which have been customarily and historically provided by civil servants arises, and where there is no showing that civil servants could not provide those services, a contract for

such services is unauthorized and in violation of the State Higher Education Personnel Law.

This is so regardless of the cost savings which might be made through such a contract.

By this pronouncement, the majority provides what the legislature did not. No basis in the statute for the specifics of this rule is identified; nor does the majority refer to any express provision in the statute which is violated by the contract or which evinces a legislative intent to govern matters not affecting established positions and employees. The reason for this omission of statutory authority is quite simple—there is none. The rule announced is neither mandated nor supported by the act; it is the product of judicial fiat.

Even if there were some basis of support for the majority's decision, RCW 43.19.190(2) compels a contrary result. That provision, last comprehensively amended by Laws of 1975–76, 2d Ex. Sess., ch. 21, § 2, p. 49, 50, delegates to the state purchasing director for the Department of General Administration the power to "[p]urchase all material, supplies, *services* and equipment needed for the support, *maintenance,* and use of all . . . community colleges . . ." (Some italics mine.)

The record contains a series of letters and memoranda from the Department of General Administration specifically authorizing Spokane Community College to purchase particular services, including "janitorial services". Thus, even if the provisions of RCW 28B.16 could be construed as implying that the contract was outside the authority of the college, the specific delegation evidenced by RCW 43.19.190 and these documents in the record direct a contrary result.

Judicial legislation as exemplified by the majority opinion is, in my view, impossible to justify when, as here, it deliberately reaches beyond the clearly stated purpose of an act. This incursion of the legislative function is particularly deplorable when it is accomplished in the face of an express statute to the contrary (RCW 43.19.190).

I dissent.

STAFFORD and BRACHTENBACH, JJ., concur with HICKS, J.

Reconsideration denied December 14, 1978.